**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: <u>December 28, 2018</u>

**No. A-1-CA-35800**

**MARIA CUMMINGS, Individually and as Personal Representative of the ESTATE OF SHAUN MICHAEL CHAVEZ; JANA VALLEJOS, Individually and as Personal Representative of the ESTATE OF DONOVAN VALLEJOS; and LEON SALAZAR, Individually, on behalf of themselves and all others similarly situated,**

      Plaintiffs-Appellants,

v.

**BOARD OF REGENTS OF THE UNIVERSITY OF NEW MEXICO, a body corporate of the State of New Mexico, for itself and its public operations, including UNIVERSITY OF NEW MEXICO HEALTH SCIENCES CENTER, and its components, THE UNIVERSITY OF NEW MEXICO HOSPITAL, and UNIVERSITY OF NEW MEXICO SCHOOL OF MEDICINE,**

      Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Alan M. Malott, District Judge**

Vigil Law Firm, P.A.
Jacob G. Vigil
Albuquerque, NM

Freedman Boyd Hollander Goldberg Urias & Ward, P.A.
Joseph Goldberg
Frank T. Davis
Albuquerque, NM

for Appellants

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Edward Ricco
Leslie McCarthy Apodaca
Andrew G. Schultz
Nelson Franse
Albuquerque, NM

Walz & Associates
Jerry Walz
Albuquerque, NM

for Appellees

**OPINION**

**VIGIL, Judge.**

{1}     Plaintiffs, Maria Cummings, individually and as personal representative of the estate of her son Shaun Michael Chavez, brought a class action complaint for medical and other negligence against Defendants (UNMH) resulting from treatment provided to pediatric cancer patients at UNMH. Plaintiffs appeal from an order of the district court dismissing their claims on grounds that UNMH did not receive notice of Plaintiffs' claims as required by the Tort Claims Act (TCA), NMSA 1978, Section 41-4-16 (1977). We conclude that Plaintiffs provided UNMH with written notice of their claims in compliance with the TCA and reverse. Because we reverse on this basis, we do not address Plaintiffs' remaining arguments.

**BACKGROUND**

**I.      The UNMH Investigation of Its Pediatric Oncology Program**

{2}     In 1987, after a review of UNMH's pediatric cancer program conducted by physicians from the Dana-Farber Cancer Institute and Harvard Medical School, UNMH received a letter stating that UNMH was not employing standard protocols in treating its pediatric cancer patients and "[s]trongly encourage[d] that all children with cancer be treated on protocols if at all possible." On March 3, 1997, Dr. Jami Frost, a physician in the pediatric cancer program at UNMH, wrote a

letter to the Chair of the Department of Pediatrics, Dr. John Johnson, expressing concern about UNMH's treatment of pediatric cancer patients. The letter states:

> Dr. Winter and I have identified several of our patients who are presently receiving non-standard treatment for their high risk ALL. This treatment, known as LSA2L2, was standard therapy for children in the 1970s. Since that time, several research trials have proven that this treatment is not as effective in providing long-term disease-free survival for children with high risk leukemia. . . . It appears that children treated at UNM Pediatric Oncology Program have been treated on this same protocol for many years, without any changes made in regard to availability of more effective therapy.

> I have contacted two nationally recognized experts in the treatment of childhood leukemia. . . . Both of these consultants agree that this treatment is substandard. Both agreed that it is not medically ethical to continue these patients on this protocol[.]

{3} On May 13, 1997, Dr. Frost followed up with a memorandum addressed to Dr. Johnson and other UNMH administrators, including the Dean of the University of New Mexico Medical School, Paul Roth, discussing the findings of her investigation into the treatment of pediatric cancer patients at UNMH between approximately 1980-1997. Dr. Frost's memorandum indicated that the survival rate for these patients was "well below published national rates." Dr. Frost's memorandum was accompanied by a list of 217 pediatric cancer patients whose treatment was reviewed and who were currently receiving treatment, with an acknowledgment that the list may not be exhaustive of all pediatric cancer patients treated at UNMH between 1980 and 1997. Shaun is not on the list.

2

**{4}** In response to Dr. Frost's letter and memorandum, UNMH began an internal investigation into the treatment of pediatric cancer patients by Dr. Marilyn Duncan, M.D. for acute lymphoblastic leukemia (ALL). On April 9, 1998, UNMH notified at least two of its patient health insurance carriers that Dr. Duncan had been placed on extended leave and was no longer seeing patients while UNMH conducted an investigation into her treatment of pediatric cancer patients, which "apparently was not a treatment recommended by national pediatric oncology clinical trials groups." UNMH emphasized that "we are sending you this notice, because you need to be aware of [Dr. Duncan's] status in the event that [you] receive[] calls regarding her. . . . [UNMH] is presently conducting a comprehensive investigation of this matter and is attempting to determine its implications for both our patients and our institution."

**{5}** Dr. Cristina Beato, the Assistant or Associate Dean of UNMH, stated that as part of UNMH's investigation, she "instructed employees of UNMH to call certain patients treated for ALL by Dr. Duncan, as well as families of patients so treated, and inform them that they or their children may not have received the recommended treatment for their ALL." Ms. Cummings was not contacted.

**{6}** In making these calls, Dr. Beato instructed the callers to "complete a 'telephone work sheet' " or script. These scripts are marked "ATTORNEY-CLIENT PRIVILEGED[.]" One script dated March 29, 1998, titled "Child has

died script[,]" prompts the caller to say "[w]e are contacting families of children treated for leukemia here, because it now appears that at least some of the children did not receive all of the treatment that was recommended at the time the children were being seen." The script includes "possible appropriate answers" to patients' families concerning the physician who treated their child, which are limited to "I'm sorry I don't have any first-hand knowledge about that" and "I'm not in administration and I just don't have any first-hand information about that." The script also contains a section titled "WHAT NOT TO TALK ABOUT[.]" The points under this heading direct:

1. Do not volunteer anything about who was prescribing or supervising the treatment.

2. Don't get into the specifics of which protocols were or were not followed.

3. Don't make any statements about what effect the problems may or may not have caused in the treatment of children—there are too many variables of treatment to even attempt this fairly at this point.

4. Don't say anything about how the problem was uncovered— you have no first-hand information about that, and that the matter is under internal investigation and [is] the subject of a personnel action.

{7} Similarly, another script titled "Script 2b – Child who was in remission, but has suffered a relapse and is currently in treatment" states that "[t]he physician who made the decisions on how to treat pediatric oncology patients at UNM for

4

many years and who was responsible for selecting the treatment to be provided to your child, is now on extended leave and is no longer seeing patients. However, we have learned that this physician did not select treatment for your child that was the treatment recommended at that time by a national clinical trials group supported by the National Cancer Institute [called the Pediatric Oncology Group (POG)]." The script goes on to state:

> UNM is in the process of investigating why your child and certain others with ALL did not receive the treatment recommended by POG. In August 1996, two new pediatric oncologists . . . joined our staff. As they became more familiar with the treatments that had been provided in the past, they, along with nurses, pharmacists and social workers of the pediatric oncology team, began to raise concerns about therapy choices for children with ALL, which led us to reexamine the treatment given to your child.

> Although the physician who chose the treatment for your child did not select the POG-recommended treatment, even though that physician was a member of POG and very knowledgeable about its recommended treatment protocols, the physician apparently believed the treatment being prescribed for your child would be equally effective. We do not know if that treatment was equally effective for your child.

## II. The Litigation Against UNMH

{8} On February 27, 2001, the estate of Steven Lawrence Lovato filed a class action complaint against UNMH, which we refer to as the *Lovato* class action, grounded on the alleged negligence of Dr. Duncan in her evaluation, care, and treatment of pediatric cancer patients at UNMH. On June 1, 2001, a second class action complaint was filed by the estate of Christopher Joseph Sedillo against

5

UNMH, which we refer to as the *Sedillo* class action. The *Sedillo* class action was grounded on the same alleged negligence of Dr. Duncan.

{9} On December 3, 2001, the *Lovato* class action plaintiffs filed a motion to allow Plaintiffs to be joined as plaintiffs and additional class representatives. The moving papers assert that the named plaintiff in the *Lovato* class action and Shaun were both pediatric leukemia patients of Dr. Duncan and members of the putative class. The motion was granted. For reasons not pertinent to the appeal, the Lovato plaintiffs were later dismissed from the *Lovato* class action, and the caption was amended to reflect that Plaintiffs were henceforth the plaintiffs in the *Lovato* class action. The operative complaint in this appeal is the third amended *Lovato* class action complaint in which Plaintiffs are named as plaintiffs and class representatives.

{10} UNMH subsequently filed a motion to dismiss Plaintiffs' complaint, alleging that Plaintiffs failed to provide notice of their claims as required by the TCA. After Plaintiffs responded, the district court granted the motion to dismiss on the basis that Plaintiffs are "unable to establish that UNM[H] was ever given timely notice by Plaintiff Cummings, on her own behalf or on behalf of Shaun Cummings, that there was a likelihood of litigation stemming from the pediatric oncology facility's conduct." Plaintiffs filed a motion to reconsider, which the district court denied. In denying the motion to reconsider, the district court

explained its reasoning was that "regardless of when the time period for purposes of [TCA] notice began to run," Plaintiffs "failed to establish that UNM[H] was ever provided appropriate notice." {11} Initially, we observe that the district court used an incorrect standard in granting UNMH's motion to dismiss. The burden was not on Plaintiffs to prove proper notice under the TCA—it was UNMH's burden to prove inadequate notice. *Dutton v. McKinley Cty. Bd. of Comm'rs*, 1991-NMCA-130, ¶ 7, 113 N.M. 51, 822 P.2d 1134 ("[U]nder the [TCA] defendants have the burden of proving that the notice requirement was not met."). Plaintiffs appeal.

### III.  Facts Relating to Notice

{12}    Shaun was born on January 1, 1978. He was diagnosed with ALL when he was eighteen months old, and was treated at UNMH by Dr. Duncan. In 1980, Shaun moved with his family to Cleveland, Ohio for about six months while Shaun's ALL was in remission, and then returned to New Mexico, where he relapsed. Shaun continued treatment at UNMH, where he was placed on a LSA2L2 chemotherapy regimen in December 1981. Shaun passed away on September 29, 1983, from complications of ALL.

{13}    In early January 2001, Ms. Cummings retained counsel to represent her in a potential case against UNMH relating to Shaun's care and treatment. When she met with counsel, Ms. Cummings did not know what treatment protocols Shaun had received at UNMH. At no time, while Shaun was being treated at UNMH, or

after he passed away, did UNMH notify Ms. Cummings that it had not followed nationally recognized, proper treatment protocols when treating Shaun for ALL.

**{14}** On February 22, 2001, counsel requested a complete copy of Shawn's medical records from UNMH. When the medical records were produced, they revealed that Shaun was treated with a LSA2L2 protocol which, Ms. Cummings declared in an affidavit, "was the subject of a class action case brought against UNMH by the Sedillo family," and "was the first time I learned that Shaun did not receive the proper ALL treatment at UNMH."

**{15}** Shortly after receiving Shaun's medical records, Ms. Cummings signed an affidavit under the caption of the *Sedillo* class action on July 24, 2001, which was filed in the *Lovato* class action on July 26, 2001. The affidavit was filed in support of a motion to consolidate the *Sedillo* class action into the *Lovato* class action. We refer to this affidavit as the "notice affidavit" which we discuss in greater detail below. The motion to consolidate was denied, but has no bearing on our analysis.

**DISCUSSION**

**{16}** To maintain a claim of damages against a governmental agency, the TCA requires that the agency have notice of the claim. *See* Section 41-4-16. Among the ways in which the notice requirement may be satisfied is by "written notice" that is presented "to the risk management division for claims against the state" which stated "the time, place and circumstances of the loss or injury." Whether the

8

district court properly dismissed Plaintiffs' claims for failing to comply with the TCA's notice requirement presents an issue of law, which we review de novo. *See Herald v. Bd. of Regents of Univ. of N.M.*, 2015-NMCA-104, ¶¶ 21, 48-51, 357 P.3d 438 (applying de novo review to order dismissing TCA claims for failing to comply with TCA notice requirement); *Smith v. State ex rel. N.M. Dep't of Parks & Recreation*, 1987-NMCA-111, ¶ 15, 106 N.M. 368, 743 P.2d 124 ("[W]hether written notice is sufficient is a question for the court."). We discuss whether UNMH received written notice as required by the TCA, then address whether that notice was timely.

## IV. Sufficiency of the Written Notice

{17} In the notice affidavit, Ms. Cummings states: Shaun was diagnosed with ALL when he was one and one-half years old; he was diagnosed and treated at UNMH on the LSA2L2 regimen; it was Dr. Duncan who treated him; and Shaun died on September 29, 1983. Ms. Cummings further states in the notice affidavit that she and Shaun's estate are members of the *Lovato* and *Sedillo* class actions, "and as such, have an interest and are parties to the lawsuits."

{18} When the notice affidavit was filed in July 2001, the pending *Lovato* and *Sedillo* class action complaints included allegations that Dr. Duncan was negligent in her evaluation, consultation, care, and treatment of children suffering from cancer from the time she commenced working at UNMH until she stopped

9

practicing at UNMH; that Dr. Duncan's negligence resulted in the children suffering injuries and death as well as damages to the parents of the children; that UNMH was vicariously liable for Dr. Duncan's negligence, as well as liable for its own negligence. Ms. Cummings individually, and as representative of Shaun's estate, clearly falls within the class described in the *Lovato* class action complaint which is described as including "parents or other affected family members of a Duncan/UNMH patient" as well as:

> Any person who was seen by or whose medical care involved Dr. Marilyn Duncan for the purpose of evaluation, consultation, treatment and/or care for a medical condition involving any form of childhood cancer from the first year she practiced medicine, or was employed and/or had privileges to practice medicine at UNMH as a physician specializing in the evaluation, consultation, care and treatment of children suffering from cancer until the time she ceased to practice medicine at UNMH.

Shaun's estate is also included within the class described in the *Sedillo* class action as including:

> All patients diagnosed with ALL or AML [acute myeloblastic leukemia] who Marilyn Duncan/UNMHSC actually treated with chemotherapy for purposes of notice only.

{19}    Counsel for UNMH, which Plaintiffs describe as "UNM's (and its risk management's) litigation attorney," both accepted service of the *Lovato* class action complaint and was served with the notice affidavit in the *Lovato* class action.

{20} The *Lovato* class action complaint, filed on February 27, 2001, clearly provided UNMH with notice of claims against it arising from allegations of fact that Dr. Duncan was negligent in evaluating, consulting, care, and treating all of her pediatric cancer patients during the entire time she was employed by UNMH, and that the survival rate of pediatric cancer patients of Dr. Duncan between 1981 and 1983 is well below published national rates. The *Lovato* class action complaint also gave UNMH notice of claims against it for its own alleged negligence. No allegations have ever been made that UNMH was unable to investigate the claims made in the original *Lovato* class action complaint, and in fact, the record demonstrates that UNMH conducted a thorough investigation before the *Lovato* class action complaint was filed and concluded that Dr. Duncan's treatment of her pediatric cancer patients "apparently was not a treatment recommended by national pediatric oncology clinical trial groups." These facts demonstrate that UNMH was aware of the time, place, and circumstances of Dr. Duncan's and its own alleged negligence, together with the fact that it was in fact sued for the alleged negligence.

{21} The purpose of the TCA notice requirement "is to ensure that the agency allegedly at fault is notified that it may be subject to a lawsuit" and to "reasonably alert the agency to the necessity of investigating the merits of the potential claim against it." *Herald*, 2015-NMCA-104, ¶ 50 (alteration, internal quotation marks,

11

and citations omitted). The notice affidavit gave UNMH notice that Plaintiffs actually intended to make claims against UNMH for their losses and injuries allegedly caused by the negligence alleged in the *Lovato* and *Sedillo* class action complaints. As Plaintiffs point out, the notice affidavit identifies Ms. Cummings and Shaun's estate by name; it states that Shaun was diagnosed and treated by Dr. Duncan at UNMH; that Shaun died on September 29, 1983; and that Ms. Cummings considers herself and Shaun's estate to be members of the classes in the *Lovato* and *Sedillo* class actions. In addition, when the notice affidavit was filed, UNMH had already conducted investigations into the alleged negligence of Dr. Duncan, and notified at least two of its patient health insurance carriers of the investigations. Under the circumstances, we fail to see how UNMH can seriously argue that it was not given "written notice stating the time, place and circumstances of the loss or injury" suffered by Ms. Cummings and Shaun's estate. *See* Section 40-4-16(A). All of the reasons for giving written notice under the TCA were satisfied.

{22} For the foregoing reasons, we conclude that UNMH was given written notice of the time, place and circumstances of the alleged loss or injury suffered by Plaintiffs as required by Section 41-4-16(A) of the TCA. We note that UNMH does not argue that delivery of the notice affidavit to UNMH's attorneys fails to satisfy the TCA under the circumstances. *See Martinez v. City of Clovis*, 1980-

12

NMCA-078, ¶ 18, 95 N.M. 654, 625 P.2d 583 (applying common rules of agency to conclude that proper notice was given arising from negotiations between the plaintiff's attorneys and the agency's insurer). Moreover, there is no material distinction between giving notice through an affidavit attached to a pleading and sending a letter with the same affidavit attached. The only remaining question is whether the notice was timely, and we now turn our attention to that question.

## V.    Timeliness of the Notice

**{23}**    Section 41-4-16(C) of the TCA provides that in a claim for wrongful death, "the required notice may be presented by, or on behalf of, the personal representative of the deceased person . . . within six months after the date of the occurrence of the injury which resulted in the death." The notice requirement under the TCA "accrues when the plaintiff knows or should know the relevant facts, whether or not the plaintiff also knows that these facts are enough to establish a legal cause of action" *Maestas v. Zager*, 2007-NMSC-003, ¶¶ 20-21, 141 N.M. 154, 152 P.3d 141.

**{24}**    Under *Maestas*, we conclude UNMH received timely notice. The undisputed facts show that Shaun's death on September 29, 1983, followed his receipt of a LSA2L2 chemotherapy regimen. Ms. Cummings did not discover the facts relevant to her claim against UNMH until she retained counsel to investigate her potential wrongful death claim against UNMH arising from the hospital's treatment of Shaun and received Shaun's full medical records, which occurred, at the very earliest, on the same day Ms. Cummings' counsel requested Shaun's full medical records from UNMH on February 22, 2001. This conclusion is supported by the affidavit filed by Ms. Cummings in response to UNMH's motion to dismiss, in which she stated that at no time during Shaun's treatment did UNMH inform her that it did not follow nationally recognized standard protocols for treatment of

14

ALL; at no time between when Shaun passed away in September, 1983 to the present has UNMH notified her that it failed to follow nationally recognized protocols for ALL in treating Shaun; and that no one from UNM ever called, wrote, or otherwise contacted her about Shaun's treatment at UNMH. Five months and five days passed between February 22, 2001, and the date on which Cummings filed the notice affidavit—on July 26, 2001. Therefore, by the time the six-month period for giving UNMH notice under the TCA expired on August, 22, 2001, the hospital had already received notice of Plaintiffs' claims.

**CONCLUSION**

{25}     The order dismissing Plaintiffs' claims and entering judgment in favor of UNMH on grounds that notice of Plaintiffs' was not provided to UNMH as required by the TCA is reversed.

{26}     **IT IS SO ORDERED.**


_____
**MICHAEL E. VIGIL, Judge**

**WE CONCUR:**


_____
**J. MILES HANISEE, Judge**


_____
**JULIE J. VARGAS, Judge**

15